# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| _____ | ) | |
| | ) | |
| SCHYLER RILEY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 16-109637-DJC |
| | ) | |
| NANCY A. BERRYHILL,[1] | ) | |
| Acting Commissioner, | ) | |
| Social Security Administration, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |
| _____ | ) | |

## MEMORANDUM AND ORDER

**CASPER, J.**                                                                 **August 30, 2017**

## I.    Introduction

Plaintiff Schyler Riley ("Riley") filed an application for supplemental security income ("SSI") with the Social Security Administration ("SSA"). R. 154.[2] Pursuant to the Social Security Act, 42 U.S.C. § 405(g), Riley brings this action for judicial review of the final decision of the Commissioner of the SSA ("Commissioner"), issued by an Administrative Law Judge ("ALJ") on September 25, 2014. See R. 6, 12. Before the Court is Riley's motion to reverse the ALJ's decision denying SSI, D. 20, and the Commissioner's motion to affirm the decision, D. 24. For the reasons

---

[1] Nancy A. Berryhill is now Acting Commissioner of Social Security. Pursuant to Fed. R. Civ. P. 25(d), the Court has substituted Nancy A. Berryhill for the prior Acting Commissioner Carolyn W. Colvin as Defendant in this suit.

[2] "R" refers to the administrative record, D. 13.

discussed below, the Court DENIES Riley's motion to reverse and GRANTS the Commissioner's motion to affirm.

## II.    Factual Background

Riley was born on January 11, 1967 and was forty-five years old when she filed a claim for SSI on October 19, 2012. R. 99. In her claim, she alleged post-traumatic stress disorder ("PTSD") as her disability, with an onset date of October 17, 2012. R. 99-100.

## III.    Procedural History

Riley filed an application for SSI on October 19, 2012. R. 99. The SSA determined Riley was not disabled and denied her claim on March 7, 2013. R. 103, 117. Riley filed a request for reconsideration on April 6, 2013 and her claim was again denied. R. 120-21. On June 11, 2013, Riley filed a request for a hearing before an ALJ, R. 124, which was held on August 8, 2014, R. 29. Riley appeared at this hearing in person and was not represented. R. 31. The ALJ found Riley not disabled and denied her application on September 25, 2014. R. 12. Riley filed a request for review of the ALJ's decision on November 11, 2014. R. 10. The Appeals Council denied Riley's request for review on December 31, 2015, rendering the ALJ's decision the final decision of the Commissioner. R. 6. Riley submitted a request, dated February 21, 2016, for an extension to file a civil complaint. R. 2. The Appeals Council granted the request. R. 1.[3]

---

[3] Having been granted an extension to file a motion to affirm by June 16, 2016, D. 22, the Commissioner ultimately filed its motion and memorandum on June 20, 2016, D. 24-25, along with a corresponding second motion for extension to the same day, D. 23. Riley then filed a motion for a default judgment, D. 26, as well as an opposition to the Commissioner's June 20 motion for extension of time, D. 27. The Court has "broad discretion in assessing [] case management decisions" such as whether to accept filings that are late due to excusable neglect. Perry v. Wolaver, 506 F.3d 48, 56 n.10 (1st Cir. 2007); see Gill v. United States, No. C.A. 05-10309-MLW, 2009 WL 3152892, at *3 (D. Mass. Sept. 25, 2009) (discussing factors for determining whether delay is due to excusable delay). Here, after the extension to June 16th, the Commissioner filed her brief a mere four days later accompanied by a motion for extension for filing that day, noting that the failure to do so by June 16th had been inadvertent. D. 23. The Court finds no bad faith or

**IV. Discussion**

    **A. <u>Legal Standards</u>**

       *1. Entitlement to SSI*

Entitlement to SSI turns on whether the claimant has a disability, defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 416(i)(1), 423(d)(1)(A); 20 C.F.R. § 416.905(a). This impairment must be severe, rendering the claimant unable to do his or her previous work or any other gainful activity existing in the national economy for which the claimant is qualified. 20 C.F.R. § 416.905(a).

There is a five-step process to determine whether a claimant has a disability. <u>Id.</u> § 416.920. The analysis may conclude at any step. <u>Id.</u> § 416.920(a)(4). First, if the claimant is engaged in substantial gainful activity, the Commissioner will find the claimant not disabled. <u>Id.</u> § 416.920(a)(4)(i). Second, if the claimant has not had a severe impairment or combination of impairments during the relevant time period, the Commissioner will find the claimant not disabled. <u>Id.</u> § 416.920(a)(4)(ii). Third, if the severe impairment meets or equals those listed in SSA regulations, the claimant is found disabled. <u>Id.</u> § 416.920(a)(4)(iii). Fourth, the Commissioner determines the claimant's residual functional capacity ("RFC"). <u>Id.</u> § 416.920(a)(4)(iv). If the RFC is such that the claimant can still perform past relevant work, the claimant is found not disabled. <u>Id.</u> Fifth, if the RFC, considered in conjunction with the claimant's age, education and

---

intent to delay and finds no prejudice to Riley from the short delay. Accordingly, the Court ALLOWS the Commissioner's motion for extension *nunc pro tunc*, D. 23, and DENIES Riley's motion for default judgment, D. 26.

work experience, renders the claimant unable to do any other work in the national economy, the Commissioner will find that the claimant is disabled.  Id. § 416.920(a)(4)(v).

## 2.  *Standard of Review*

The Court may affirm, modify or reverse the decision of the Commissioner with or without remanding the case for a rehearing.  42 U.S.C. § 405(g).  This review is "limited to determining whether the ALJ used the proper legal standards and found facts upon the proper quantum of evidence."  Ward v. Comm'r of Soc. Sec., 211 F.3d 652, 655 (1st Cir. 2000).  The Commissioner's findings of fact are conclusive if supported by substantial evidence, 42 U.S.C. § 405(g); Manso-Pizarro v. Sec'y of Health & Human Servs., 76 F.3d 15, 16 (1st Cir. 1996), which exists when "more than a mere scintilla" supports the conclusion, Richardson v. Perales, 402 U.S. 389, 401 (1971).  The Commissioner's findings of fact "are not conclusive when derived by ignoring evidence, misapplying the law, or judging matters entrusted to experts."  Nguyen v. Chater, 172 F.3d 31, 35 (1st Cir. 1999) (citing Da Rosa v. Sec'y of Health & Human Servs., 803 F.2d 24, 26 (1st Cir. 1986)).

Issues of credibility and inferences drawn from the facts on record are the responsibility of the Commissioner, who ultimately resolves conflicts in the evidence and determines the disability status of the claimant.  Lizotte v. Sec'y of Health & Human Servs., 654 F.2d 127, 128 (1st Cir. 1981).  As such, the Court must uphold the Commissioner's decision when "a reasonable mind, reviewing the evidence in the record as a whole, could accept it as adequate to support [the] conclusion," even if the record could support multiple decisions.  Dedis v. Chater, 956 F. Supp. 45, 49 (D. Mass. 1997) (quoting Ortiz v. Sec'y of Health & Human Servs., 955 F.2d 765, 769 (1st Cir. 1991)); see Evangelista v. Sec'y of Health & Human Servs., 826 F.2d 136, 144 (1st Cir. 1987).

The Court may liberally construe a *pro se* plaintiff's allegations. King v. Colvin, 128 F. Supp. 3d 421, 439 (D. Mass. 2015); see Tefera v. Colvin, 61 F. Supp. 3d 207, 214 (D. Mass. 2014).

## **B. Before the ALJ**

### *1. Medical History*

#### a. PTSD

In November 2010, Riley saw a psychologist, David H. Gover, Ed.D., through Massachusetts Rehabilitation Services ("Mass Rehab") for a mental status examination. R. 315-19. Riley told Dr. Gover she was fired from her job at Best Buy for "vulgar language and threatening behavior" even though she was "doing good work." R. 315-16. Riley also stated that she had "some problems in the area of verbal comprehension." R. 316. Dr. Gover did not observe signs of depression or anxiety, R. 315, and noted Riley was "very verbal and personable," R. 317. Dr. Gover also reported "a faint paranoid aroma," R. 318, but remarked, "[Riley] had a very interesting story for every adversity, but they were all so plausible that I can't say they don't just represent a rather long bad situation," R. 316. He further noted that Riley "appear[ed] to have a way of placing blame on a lot of people in her life for things that have gone wrong for her," which often happens when someone "whose understanding of emotions is low, but their responsiveness to them is of an exaggerated nature." R. 317. Dr. Gover noted that Riley "appeared to have the cognitive capacity to learn, understand and perform well in a wide variety of job situations, but she need[ed] to deal with emotional factors that have interfered with her performance on a chronic basis," id., which could be treated most successfully with one-on-one psychotherapy, R. 318. He

suggested that Riley's presentation was more indicative of a personality disorder than an affective disorder.  R. 317.  Dr. Gover gave Riley a GAF[4] score of 75.

Riley began treatment with a psychiatrist, Murtuza Vali, M.D., in October 2012.  R. 286.  Dr. Vali observed Riley was coherent in speech and thoughts, cooperative, goal directed and had a "congruent" affect, although Riley reported feeling depressed that day.  Id.  Dr. Vali noted Riley had a "bizarre" paranoia "regarding [a] family member [who] was experimented on in school" and "poor insight into [the] nature of [her own] suspiciousness and paranoia."  Id.  Dr. Vali diagnosed Riley with PTSD with "possible persecutory delusions" and prescribed Abilify, giving Riley a GAF score of 40.  Id.

On November 7, 2012, Dr. Vali noted Riley was "pleasant and smiling," cooperative and "less distressed."  R. 284.  Dr. Vali also observed that Riley was goal directed and coherent in speech and thoughts, assessing a GAF score of 40.  Id.  Riley told Dr. Vali she had been compliant with Abilify, though her "past trauma still bother[ed] her and she [was] depressed [about] not having her son . . . [who was] currently . . . in [the Department of Children and Families] custody." Id.  Dr. Vali reported that Riley's previous paranoia regarding a family member had decreased in intensity and concluded that Riley had shown overall improvement with Abilify.  Id.

On November 7, 2012, Dr. Vali completed a mental health assessment for Riley.  See R. 252-55.  Dr. Vali stated Riley complained of "grief and feelings of loss related to [her] son being

---

[4] A GAF score between 71 and 80 indicates that if symptoms are present, they are "transient" and there is "no more than slight impairment in social, occupational or school functioning."  Diagnostic and Statistical Manual of Mental Disorders 34 (Am. Psychiatric Ass'n., 4th ed. 2000).  A GAF score between 51 and 60 indicates moderate symptoms or "moderate difficulty in social, occupational, or school functioning (e.g. few friends, conflicts with peers or co-workers)."  Id.  A GAF score between 31 and 40 indicates "[s]ome impairment in reality testing or communication" or "major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood."  Id.

removed" from her home. R. 252. Additionally, Dr. Vali noted that Riley "present[ed] with numerous delusions including thinking that her son has a 'genetic alteration' and that the school was 'running experiments' on him" and Riley "report[ed] flashbacks related to [domestic violence] by [her] ex-boyfriend." <u>Id.</u> Dr. Vali observed that Riley was well groomed, had a "good rapport," appeared of average intelligence and "report[ed] no memory or concentration problems," while also stating that Riley had "mild tangentiality on thought processes" and a "somewhat incongruent" mood and affect. <u>Id.</u> Dr. Vali noted Riley's PTSD diagnosis and Abilify prescription. R. 253. In regard to Riley's functional capacity, Dr. Vali opined that Riley had an impairment that would affect her ability to work and would last more than a year. R. 255. Dr. Vali observed that Riley's suspiciousness could "affect her ability to work with her colleagues." R. 254.

On December 14, 2012, Dr. Vali noted that Riley "appeared pleasant and smiling." R. 282. Dr. Vali also reported that Riley denied any paranoid concerns and stated her past trauma still bothered her. <u>Id.</u> Additionally, Dr. Vali observed that Riley was cooperative, less distressed, goal directed and coherent in speech and thoughts. <u>Id.</u> Dr. Vali concluded Riley had shown improvement with Abilify, although she still had "poor insight into nature of suspiciousness and paranoia," and increased Riley's dosage. <u>Id.</u> Dr. Vali assessed Riley's GAF score at 55. <u>Id.</u>

On March 7, 2013, Dr. Vali noted Riley "appeared pleasant and smiling this afternoon . . . had been compliant [with] Abilify . . . denied any paranoid concerns . . . stated past trauma still bother[ed] her . . . [and] denied any significant PTSD [symptoms]." R. 295. Dr. Vali also noted that Riley was goal directed and coherent in speech and thoughts and had fair insight and judgment. <u>Id.</u> Dr. Vali assessed that Riley had shown overall improvement with Abilify and gave her a GAF score of 60.

Steven N. Shapse, Ph.D., a psychologist, saw Riley in March 2013. R. 298. He spoke with Riley and conducted a number of psychological tests. R. 298-307. Dr. Shapse found that Riley was oriented to time, date, place and person, appropriately dressed in casual attire, able to maintain attention, generally able to comprehend instructions and completed all required tasks as directed. R. 302. Dr. Shapse also observed that Riley's range of emotions was "normal with affect consistent with topics discussed," there was "no evidence of delusions or hallucinations nor did she appear paranoid" and she had intellectual functioning in the average to high average range. Id. Furthermore, Dr. Shapse determined that Riley's memory function was unimpaired, her interpersonal style was cooperative and her insight and judgment were appropriate. Id. Dr. Shapse stated that Riley "evidenced no special or behavioral needs." Id.

Dr. Shapse noted that Riley reported she experienced few symptoms related to PTSD, but "[t]esting reveal[ed] otherwise," R. 302, as she "indicate[d] past traumatic stresses: reliving something horrible that has occurred in the past and being long time troubled by memories of a bad experience," R. 303. He explained that the "[t]ests showed a defensive response style which limits the utility of these findings" as Riley "did not answer questions in a forthright manner, tending to portray herself as being relatively free of common shortcomings to which most individuals will admit," and "was reluctant as well to recognize minor faults in herself." R. 302. Dr. Shapse noted that this type of defensive response is "actually common in custody and termination of parental rights matters" and stems from "concern about being evaluated unfavorably." R. 302-03. Furthermore, Riley's "level of defensiveness or 'look good' responding [was] not necessarily higher than others being evaluated for similar reasons." R. 303. Dr. Shapse commented that the "reader of this report should therefore note that the following findings may underestimate the level of pathology of any psychological disturbance . . . [and] special attention

should be paid to findings that do break through this defensive bulwark." Id. Dr. Shapse determined that Riley's response style "suggest[ed] that she [was] somewhat emotionally restrained, well socialized, engage[d] in socially acceptable behavior and lack[ed] insight." Id.

Dr. Shapse concluded that Riley's personality style is characterized by compulsive and histrionic traits, both of which were "associated positively with factors reflecting good mental health." Id. Because of these characteristics, Riley was "likely to be disciplined and ordered, though at times . . . dramatic and over reactive." Id. Dr. Shapse also observed that the results of Riley's Rorschach Inkblot Test ("RIBT") suggested "hypervigilance and depression accompanied by misperception and distortion in how she takes in information and subsequently how she views her world." R. 304. Dr. Shapse noted that the trauma in Riley's past likely led to this hypervigilance, which could impede her functioning. Id. Dr. Shapse also explained that despite this hypervigilance, it was "overreaching to conclude that a disturbance in reality testing is present, though such should not be definitively ruled out." Id. He noted that "[i]t [was] not found otherwise that [Riley's] reality testing suffers; that she is unable to separate reality from fantasy." Id. In regard to cognitive abilities, Dr. Shapse determined that Riley had "an adaptive capacity to think logically and coherently" and was "able to make reasonable conclusions regarding cause and effect." Id. He concluded that Riley's hypervigilance complicated interpersonal relationships and "likely interfere[d] with parenting effectiveness" because it "create[d] for distortion in how she views and responds to her environment," though Riley was "interested in being around others and paying attention to what they say and do as might ordinarily be expected." R. 304-05. As such, Dr. Shapse opined that Riley's hypervigilance was "open to successful remediation via targeted psychotherapy." R. 305. Dr. Shapse recommended Riley continue in psychotherapy, focusing on

increasing her trust level and willingness to accept and share psychological symptoms, as they may "interfer[e] with day-to-day life as well as imped[e] long-term goals." R. 307.

In May 2013, state agency consultant, Mary Menken, Ph.D., completed a mental residual functional capacity assessment ("MRFC"). R. 106-15. Dr. Menken noted anxiety-related disorder and "schizophrenia and other psychotic disorder[]" as disorders he considered, R. 111, noting that Riley's file indicated her condition "improved with treatment," though there may be "some ongoing problems with concen[tration]/persistence/pace & adaptation," R. 112. Dr. Menken ultimately found that Riley was not disabled. R. 114.

### b. Learning Disability

Thomas Callahan, Ph.D., an educational consultant and school psychologist, completed Riley's learning disabilities evaluation on September 13, 2002. See R. 308-14. Dr. Callahan noted that there were "[n]o deviations in attention, concentration, motivation or volition" and Riley "accepted no offer to take a break throughout the 4.5 hour testing session." R. 309. Tests revealed Riley's "cognitive abilities were found to be in the average range." R. 310. Dr. Callahan determined that Riley had "a learning disability in the area of reading comprehension." R. 312.

### c. Concussion

Reports from the emergency department of Newport Hospital indicate Riley sought medical care on June 30, 2009 and was diagnosed with post-concussion syndrome. R. 330. Riley reported that her head injury was the result of a car accident while she worked for Best Buy and she did not see a doctor until many days after the incident. See, e.g., R. 52-57, 278. The report listed discharge instructions, which included: (1) having someone stay with Riley to check for any listed warning signs; (2) applying an ice pack if swelling to the face or scalp occurred; (3) taking Tylenol or Advil for pain; and (4) following up with a physician if symptoms did not improve

within twenty-four hours.  R. 331.  At ALJ hearing, Riley indicated that she was not currently receiving any medical treatment for that injury.  R. 95.

### 2. *The ALJ Hearing*

Riley and vocational expert ("VE") Ruth Baruch testified at the hearing.  R. 29.

#### a. Riley's Testimony

Before Riley began her testimony, the ALJ advised Riley regarding her right to representation by an attorney or certified non-attorney representative who could help Riley obtain medical records, explain proceedings, protect her rights and "present the evidence in a light most favorable to [Riley's] case."  R. 31.  The ALJ also informed Riley that a representative may not charge a fee unless approved, which typically occurred only when the claimant was successful in obtaining benefits.  R. 31-32.  The ALJ further explained there were legal service organizations that worked "pro bono, that is, for free" for lower income claimants.  R. 32.  Riley responded that she "would like to go forward on [her] own."  Id.  The ALJ reiterated, "You understand what I just said in terms of the rights?" and Riley responded, "Yes, I do."  Id.  The ALJ then gave Riley a waiver of counsel to sign for the record.  R. 33.  Finally, the ALJ formally read the issues at hand, as Riley did not have a representative, "just so [she] underst[ood] what the legal issues [were]."  R. 34.

Riley testified that she graduated from high school and got her associate's degree through Mass Rehab, which took five years to complete because she took leaves of absence due to domestic violence.  R. 44-46.  She claimed she had "a pretty severe learning disability" in reading comprehension.  R. 44.  When asked about her reading and writing skills, Riley said they were okay "so far" and she could read a newspaper or magazine without any trouble, although she would "have a little difficulty."  R. 46.  Riley stated that she passed a math course as part of her general

studies, handled her own finances, paid her own bills and knew how to use a computer to go on the internet.  R. 47-48.

Riley testified she "constantly" looked for jobs and was actively searching at the time of the hearing.  R. 51, 69.  When the ALJ asked if she would be able to work at a job if she found one, Riley responded, "I would say no because I'm still under DCF care."  R. 69.  She explained that she was looking for television repair work, as that was her previous employment and she was trained on-the-job at Best Buy when she was hired.  R. 51.  Riley also stated that she had put in applications for work other than television repair.  R. 51-52.  Although offered an interview in Providence, Riley claimed she could not attend because she did not have a car.  R. 52.  Riley testified that she typically applied to jobs online.  Id.

 When speaking about her previous job in television repair at Best Buy, Riley described her duties as driving to customers' homes, diagnosing their television issues and repairing them when possible.  R. 60-61.  Riley was terminated from Best Buy, where she had worked for about two years, on October 2, 2010.  R. 39; see R. 166.  When the ALJ asked why she was terminated, Riley responded that she "had a head injury that was post concussion syndrome diagnosed after the 10 days, so they told [her] that [she] had permanent brain damage."  R. 52-53.  The ALJ then noted that the 2009 records from Newport Hospital, where Riley claimed she received this diagnosis, said "next to nothing" about the treatment for this matter.  R. 53-54.  Riley stated that she did not see a doctor until a month after the accident and was not receiving medical care for a head injury at the time of the hearing.  R. 95.  Riley believed that the 2009 car accident was what led to her termination from Best Buy, although she acknowledged that Best Buy said it was due to performance issues.  R. 58-59.  Other than her work at Best Buy, Riley intermittently volunteered

for a photographer on the weekends, helping the photographer take picture orders and payments, organize the waiting customers and pose the subjects.  R. 62-63.

Riley testified that she was diagnosed with PTSD in September 2001 after going to an emergency consult.  R. 38.  Riley explained that she had been attending counseling for two years, progressing from weekly to monthly sessions by the time of the hearing.  R. 72-73.  Riley also stated that she was taking Abilify, R. 73, and that with "the medicine [she was] able to block out a lot of emotional outbursts [] pertaining to having like flashbacks and things like that."  R. 92.

Riley stated her PTSD stemmed from domestic violence experienced during her relationship with her son's father, which ended in 2001, four months after her son was born.  R. 63-64; see R. 276.  Riley stated that on September 21, 2001 she received a year-long restraining order against her ex-boyfriend and he stalked her for approximately the next ten years.  R. 64. Riley had not had a restraining order since the 2001 order because she "needed more evidence and [she] couldn't do evidence with word of mouth."  R. 65.  Riley stated that the last time she saw her ex-boyfriend was in court in November or December of 2013 when she was trying to regain custody of her son.  R. 67-68.

Riley acknowledged that at the time of her SSI application, October 2012, child services had taken custody of her son.  See R. 66.  She stated her son was taken because of her mental health issues, explaining in part that people disagreed with her belief that her ex-boyfriend was still stalking her at that time.  Id.  Riley testified that she had regained custody of her son in September 2013, see R. 74, but the Department of Children and Families ("DCF") had supervisory visits and checked in with her son's school and Riley's friends and family.  R. 72.  Riley said her son's father did not have visitation rights and did not pay child support, but would call twice per week.  R. 68-69.  Riley stated that she lived in a "safe house" in New Bedford from approximately

February 2012 to February 2014, R. 43, her son residing with her for part of that time, and she then moved to an apartment that had "address protection through the Department of the Secretary of State," R. 41.

In regard to her daily activities, Riley stated that she kept her apartment clean, cooked, did dishes, hand washed laundry at home, took out the garbage and was able to get up and ready in the morning. R. 75-76. Riley said she had a driver's license but no access to a vehicle, so she walked and occasionally took public transportation. R. 48-49. Riley testified she took her son to school and picked him up in Fair Haven five days per week and he had not had a problem with school attendance. R. 70-71. This trip included walking a quarter of a mile, taking two buses, and walking another quarter mile. R. 71. While her son was in school, Riley attended her appointments, went to the library to search for jobs and went to Mass Rehab every two weeks for retraining. R. 77-78. Riley stated she sometimes brought her son to the library on weekends and kept in touch with a few friends, one of whom she saw "probably a couple times a month" for help with errands. R. 76-77. Riley testified that she was able to get enough sleep most nights. R. 79.

b. VE's Testimony

The VE noted Riley's relevant work history was (1) a television repairer, which is classified as medium, skilled work; (2) marketing sales, classified as sedentary, semi-skilled work; and (3) a shipping clerk, classified as light, semi-skilled work. R. 87-88. The VE testified that Riley had the transferable skills of computer data entry and some customer service. R. 88.

The ALJ asked the VE if a "person of the claimant's age, education, and work experience; able to perform duties at all exertional levels but with the following limitations . . . [s]hould avoid workplace hazards, such as dangerous machinery and unprotected heights . . . [and] due to limitations in concentration, pace, persistence, would be off task but less than 10 percent of the

workday" could perform any of Riley's past work.  R. 88.  The VE stated that such person could perform all of Riley's past relevant work.  Id.

The ALJ then posed a second hypothetical, using the same exertional level and limitations as the first and adding that the individual "would need to work in a low-stress job environment having only occasional decision-making and occasional changes in the work setting."  R. 88-89. The VE stated that such individual would not be able to perform any of Riley's past work but could perform jobs available in the national or regional economy, such as a mail sorter, electrical assembler or hand packager inspector, all of which are light, unskilled work.  R. 89-90.

The ALJ next posed a third hypothetical, using the same limitations as the second and adding that the individual would be "unable to do production pace work . . . defining that [as] assembly type work, assembly line type work or work in which you're required to put out a certain quota per hour or per day, but not . . . jobs where they might have more or less busy periods."  R. 90.  The VE responded that the same jobs available to the individual from the second hypothetical would be available to this employee because "[a]n individual in any of these types of jobs will have production expectation, but it's not where they have to put out a certain amount of jobs per hour or they have to in order for the next person to complete their job."  R. 90.

The ALJ posed a final hypothetical, noting the same exertional level and limitations already stated and adding that the individual would need "to take two or more unscheduled breaks, each break lasting 20 minutes.  These are breaks over and above the regular scheduled breaks.  And in addition, the person would be—just in general would be off task, but more—20 percent of the day rather than less than 10 percent."  R. 91.  The VE stated such individual would not be able to do any of Riley's past work and there were no jobs available in the national or regional economy.  Id.

### 3. The ALJ's Findings

At step one, the ALJ determined Riley had not engaged in substantial gainful activity since October 19, 2012, her SSI application date. R. 17. At step two, the ALJ concluded that Riley had the severe impairments of bipolar disorder, depression, anxiety and PTSD. Id. The ALJ also found Riley's concussion a non-severe impairment, as no medical evidence of record showed that it, or any resulting impairment, caused more than minimal functional limitations since the alleged onset date of October 2012. Id.

At step three, the ALJ determined that Riley did not have an impairment or combination of impairments meeting or medically equaling the severity of a listed impairment in SSA regulations. Id.; see 20 C.F.R. § 416.920(d). In particular, the ALJ considered listings 12.04 and 12.06 in 20 C.F.R. Part 404, Subpart P, Appendix 1, and the "paragraph B" criteria, which requires the claimant's mental impairments to result in marked restrictions or difficulties in at least two areas of functioning or repeated, extended episodes of decompensation. R. 17; see 20 C.F.R. § 416.925. The ALJ determined Riley had mild restrictions in activities of daily living, mild difficulties in social functioning, moderate difficulties in concentration, persistence or pace and one to two experienced episodes of decompensation. R. 18. Thus, "paragraph B" criteria were not satisfied. R. 19. The ALJ also considered "paragraph C" criteria and concluded the evidence failed to meet these requirements. Id.

The ALJ then determined Riley had the RFC to perform a full range of work at all exertional levels, but with some nonexertional limitations. R. 19. These limitations included: (1) avoiding exposure to all hazards, such as the operational control of moving machinery and unprotected heights; (2) working at a low-stress job having only occasional decision-making and changes in work setting; and (3) not engaging in production or pace work. Id. The ALJ then relied

upon the RFC at step four to determine that Riley could not perform any of her past relevant work. R. 22. At step five, the ALJ found that jobs existed in significant numbers in the national economy that someone of Riley's age, education, work experience and RFC could perform. R. 23. Accordingly, the ALJ concluded Riley was not disabled. R. 24.

### C. Riley's Challenges to the ALJ's Findings

Riley seeks reversal of the ALJ's decision for three reasons. See D. 20. First, Riley contends she was not adequately represented at the hearing. Id. at 20. Second, Riley argues that there is new, relevant medical information that was not considered at the hearing. Id. at 1, 12, 19. Third, Riley claims the ALJ erred in assessing her credibility. Id. at 1.

> *1. Riley Waived Her Right to Representation and the ALJ Did Not Err in Allowing Her to Proceed*

Riley alleges that "[t]hey just wouldn't represent [her], unless [she] paid," even though "they promise indigent people have free legal aide." Id. at 20. She claims this "compound[ed] [her] issue to defend [herself]." Id.

A claimant has a statutory right to counsel at disability hearings, but this right "'falls well below the Sixth Amendment threshold' applicable in criminal cases." Mandziej v. Chater, 944 F. Supp. 121, 130 (D.N.H. 1996) (citing Evangelista, 826 F.2d at 142); see Baez v. Astrue, 550 F. Supp. 2d 210, 216 (D. Mass. 2008); see also 42 U.S.C. § 406; 20 C.F.R. § 404.1700 (2008). The First Circuit has stated that "a claimant, after all, has as much right to proceed *pro se* as he does to engage a lawyer." Evangelista, 826 F.2d at 142 (noting that a claimant appealing a SSI determination "made a knowing and intelligent waiver of his right to representation after having been informed, both orally and in writing, of his right to counsel"). As such, "the absence of counsel, without more, creates no basis for remand." Id. A claimant must be informed of the right to counsel and a waiver is not effective if the claimant does not receive "sufficient information to

enable him [or her] to intelligently decide whether to retain counsel or proceed *pro se*." Baez, 550 F. Supp. 2d at 216 (citation and internal quotation marks omitted). Specifically, "a claimant must be informed of the benefits of procuring counsel, the prospect of either free or contingency based representation, and the statutory limitation on attorney's fees in disability cases." Id.

Riley was informed several times in writing of her right to representation and given information about organizations that could represent her. See, e.g., R. 124, 127, 132, 137. When she requested a hearing before an ALJ in June 2013, Riley confirmed under penalty of perjury, "I understand that I have a right to be represented and that if I need representation, the Social Security office or hearing office can give me a list of legal referral and service organizations to assist me in locating a representative." R. 124. That same month, the SSA sent Riley information explaining the hearing process and Riley's right to representation. See R. 127-29. This letter stated that many representatives charged a fee only upon receipt of benefits, would represent her for free or could not charge a fee unless approved by the SSA. R. 127. A notice sent in May 2014 reiterated this information. R. 137. The June 2013 and the May 2014 letters included attachments detailing Riley's right to representation, see R. 130-31, 142-43, and the June 2013 mailing also enclosed contact information for organizations that could aid Riley with representation. See R. 132-34.

Moreover, at the hearing, the ALJ explained Riley's right to an attorney or representative before he began questioning her. R. 31-33. The ALJ told Riley, "Because you are not represented, I'm required to explain that you have the right to be represented by an attorney or a non-attorney representative. . . . Such a person can help you obtain and submit medical records and other records. They can explain medical terms, make requests, protect your rights, and present the evidence in a light most favorable to your case." R. 31. He then explained that such a person generally did not or could not charge a fee unless Riley's SSI application were approved and legal

service organizations would work for free on behalf of some lower income people.  R. 31-32.

Riley responded, "I would like to go forward on my own," and when the ALJ asked if she

understood what he had "just said in terms of the rights," Riley responded that she did.  R. 32.

Riley then signed a waiver of counsel.  R. 32-33.  Riley was informed of her right to counsel, told

of the benefits of available services and received sufficient information to make an intelligent

decision regarding whether or not to obtain counsel.  Accordingly, Riley's waiver of counsel was

knowing and intelligent, and thus effective.

Even if Riley's waiver of counsel was not effective, "remand for want of representation 'is

necessitated only where there is a showing of unfairness, prejudice or procedural hurdles

insurmountable by laymen.'"  Evangelista, 826 F.2d at 142 (citing Teal v. Mathews, 425 F. Supp.

474, 480 (D. Md. 1976)); see Dillard v. Massanari, 190 F. Supp. 2d 242, 246 (D. Mass 2002)

(noting that when "a hearing is marked by unfairness due to the lack of counsel, a remand may be

appropriate").  A court may consider factors such as whether the "ALJ was solicitous in attempting

to assist the plaintiff" or the claimant was incoherent.  Evangelista, 826 F.2d at 142-43.  That is,

an ALJ has a "heightened duty to bring out relevant facts" when the claimant is unrepresented by

counsel at a hearing, Dillard, 190 F. Supp. 2d at 246, but the "mere fact that [the claimant] was

ultimately unable to persuade the ALJ to see things his way does not, without more, make out a

case for prejudice," Evangelista, 826 F.2d at 143.  The ultimate question is whether the claimant

"was able to present his case adequately, and that the ALJ was sufficiently forthcoming to meet

the attendant burden."  Id.

Had Riley not waived her right to counsel effectively, remand still would be unwarranted

because she suffered no prejudice.  The ALJ explained to Riley the purpose of the hearing, noting

that he was not bound by the SSA's earlier decision, listing the evidence he would consider and

explaining what issues he would determine. R. 33-34. The ALJ also gave Riley opportunities to ask questions to aid in her understanding of the proceedings and often clarified legal terms of art. See, e.g., 32, 37, 39. Furthermore, the ALJ gave Riley a chance to ask questions of the VE, R. 91, and asked if Riley would like to tell him anything else before concluding the hearing, R. 92. Before closing the hearing, the ALJ explained the next steps to Riley. R. 98. The hearing lasted for over an hour, see R. 31, 98, and the ALJ sufficiently solicited information and assisted Riley in presenting her case. Accordingly, Riley was able to present her case adequately and remand for unfairness or prejudice due to lack of counsel is not warranted.

### 2. The ALJ Properly Developed the Record and Remand for Consideration of New Evidence Is Not Warranted

Riley argues that "there was information that was not provided at the time [of the hearing] that needs to be provided in the medical record regarding [her] conditions and health." D. 20 at 18. She states that the "SSA has not included that updated data," id. at 19, and the "SSA didn't have a current list of diagnosis [sic]," id. at 12, when the Commissioner made a final decision regarding Riley's SSI application.

As an initial matter, the Court notes that Riley listed only PTSD as an impairment on her SSI application, see R. 99-100, and now alleges she has had "health issues like this complex PTSD, hypersomnia, asthma, breast cancer, [acid reflux], unexpected further weight gain to obesity due to cancer and [a] bimalleor [ankle] fracture, lymph cancer . . . post concussion syndrome and so many more that weren't listed," D. 20 at 12. It is unclear if Riley suffered from these newly alleged impairments at the time of her SSI application and the ALJ hearing or if they developed afterward.

SSA regulations state that the Commissioner "will consider only impairment(s) [claimants] say [they] have or about which [the Commissioner] receive[s] evidence." 20 C.F.R. § 416.912. Accordingly, a claimant must "furnish the requisite medical and other evidence within [his or her]

grasp." Philbrook v. Colvin, No. 14-cv-10766-LTS, 2015 WL 2376129, at *4 n.1 (D. Mass. May 19, 2015) (quoting Miranda v. Sec'y of Health, Educ. & Welfare, 514 F.2d 996, 998 (1st Cir. 1975)); see Bowen v. Yuckert, 482 U.S. 137, 146 n.5 (1987) (explaining that "[i]t is not unreasonable to require the claimant, who is in a better position to provide information about his own medical condition, to do so"). Consequently, an "ALJ has not 'made a mistake' in ignoring new evidence that was never presented to him." Mills v. Apfel, 244 F.3d 1, 5 (1st Cir. 2001).

Here, Riley listed only PTSD on her SSI application, R. 99-100, and agreed at the hearing that "this is a mental impairments case," R. 37, specifically disclaiming any physical impairments. Riley told the ALJ her "depression, anxiety, [and] PTSD" were the focus of her claim. Id. She provided evidence only of these mental impairments, a learning disability and a concussion. See 243-333. The ALJ cannot be faulted for failing to consider other physical impairments Riley has alleged for the first time now because the "ALJ can hardly be expected to evaluate or account for evidence that he never saw." Mills, 244 F.3d at 4. Accordingly, the ALJ did not err in considering only Riley's mental impairments, learning disability and post-concussion syndrome. See Bowen, 482 U.S. at 146 (noting that the SSA has "express statutory authority" to provide that an "individual shall not be considered to be under a disability unless he furnishes such medical and other evidence of the existence thereof as the Secretary may require"); see also Mills, 244 F.3d at 5 (explaining that the Court "may review the ALJ decision solely on the evidence presented to the ALJ").

To the extent that Riley argues the ALJ should have obtained further evidence regarding her PTSD, learning disability or post-concussion syndrome, such argument is also unavailing. "[R]emand is appropriate only where the court determines that further evidence is necessary to develop the facts of the case fully, that such evidence is not cumulative, and that consideration of

it is essential to a fair hearing." Evangelista, 826 F.2d at 139; see 42 U.S.C. § 405(g). The responsibility of the Commissioner to develop the record exists when the claimant is unrepresented; the claim itself is facially substantial; there are gaps in the evidence "necessary to a reasoned evaluation of the claim"; and the ALJ can "without undue effort," see that the gaps are "somewhat filled." Heggarty v. Sullivan, 947 F.2d 990, 997 (1st Cir. 1991) (citation omitted). While the "ALJ has a duty to develop the record, reversal of the ALJ's decision for failure to request additional information is warranted only where the ALJ's failure is unfair or prejudicial to the claimant's case." Gaeta v. Barnhart, No. 06-cv-10500-DPW, 2009 WL 2487862, at *6 n.4 (D. Mass. Aug. 13, 2009) (quoting Shannon v. Chater, 54 F.3d 484, 488 (8th Cir. 1995)). Prejudice exists when "additional evidence would have been produced if the ALJ had fully developed the record, and that the additional evidence might have led to a different decision." Id. (citing Newton v. Apfel, 209 F.3d 448, 458 (5th Cir. 2000)).

Although Riley was unrepresented, she had ample opportunity to provide the ALJ with evidence supporting her claim. Riley received a notice in June 2013 explaining the importance of providing additional evidence and the procedure for doing so. R. 128. This notice also explained that the SSA could help Riley obtain the evidence she needed. Id. Another notice sent in May 2014 reiterated these points. R. 138. Furthermore, the ALJ explained to Riley the need to have medical evidence "from doctors, including clinical, diagnostic, and laboratory findings . . . in addition to any testimony." R. 35.

Moreover, the record included evaluations from several different doctors and specialists. See, e.g., R. 282, 288, 298, 310, 330. The ALJ found that the observations of Dr. Gover, Dr. Vali, Dr. Shapse and Dr. Menken were consistent with evidence in the record, including the reports of the other doctors. R. 20-22. The ALJ also asked Riley about her daily activities, job search and

limitations during the hearing and considered her responses when making a final disability determination.  See R. 20, 22.  Although the ALJ did state he "may make one attempt to get records from" Newport Hospital regarding Riley's post-concussion syndrome, any failure to do so did not prevent the ALJ from making a reasoned evaluation of the claim nor did it prejudice Riley.  None of the multiple physician reports in the record concluded that this concussion affected Riley's mental impairments and Riley affirmed she was not receiving any medical treatment for this injury at the hearing.  R. 95.  Additionally, the ALJ questioned Riley about the circumstances of concussion.  See 52-59.  The record in Riley's case was "voluminous, detailed, and complex," Evangelista, 826 F.2d at 140, and the ALJ did "develop an adequate record from which a reasonable conclusion [was] drawn," Heggarty, 947 F.2d at 997 (citation omitted).  Accordingly, Riley suffered neither unfairness nor prejudice and the ALJ did not err by not developing the record further.

To the extent that Riley contends additional evidence became available after the ALJ hearing and should be considered, such argument also falls short.  The Court "may at any time order additional evidence to be taken before the Commissioner of Social Security, but only upon a showing that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding."  42 U.S.C. § 405(g); Mills, 244 F.3d at 5.  The claimant bears the burden of demonstrating a remand is warranted under this provision, see Melkonyan v. Sullivan, 501 U.S. 89, 100 (1991), and must demonstrate that the evidence is both new and material, Evangelista, 826 F.2d at 139.  To be considered "new," the evidence must have been unavailable during the administrative proceedings.  Miller v. Astrue, No. 2009-cv-12018-RBC, 2011 WL 2462473, at *15 (D. Mass. June 16, 2011).  Materiality exists "only if, were the proposed new evidence to be considered, the [Commissioner's] decision 'might

reasonably have been different.'"  Evangelista, 826 F.2d at 140 (quoting Falu v. Sec'y of Health

& Human Servs., 703 F.2d 24, 27 (1st Cir. 1983)).  The "'good cause' limitation come[s] into play

only 'when the district court learns of evidence not in existence or available to the applicant at the

time of the administrative proceeding that might have changed the outcome of that proceeding.'"

Seavey v. Barnhart, 276 F.3d 1, 13 (1st Cir. 2001) (quoting Sullivan v. Finkelstein, 496 U.S. 617,

626 (1990)).

At various points in her brief, Riley alludes to impairments and evidence that may post-

date the ALJ's decision.  See D. 20 at 1, 12, 18.  She has not, however, provided the Court with

any such evidence, nor has she shown how it would be material for purposes of remand.[5]  Riley

further fails to state why such evidence was unavailable during the administrative proceedings.

Consequently, Riley has not met the burden of showing that remand is warranted on this ground.

3.  *The ALJ's Determination Regarding Riley's Credibility Is Supported by
Substantial Evidence*

Riley argues that she was denied SSI "for not being forthcoming, which was, actually, a

misunderstanding on [the ALJ's] part due to lack of communication."  D. 20 at 1.

An ALJ must evaluate whether there are inconsistencies between the objective medical

evidence and the claimant's own statements about his or her symptoms.   See 20 C.F.R.

_____

[5] The only new evidence provided is a letter Riley wrote stating she was "physically disabled as
of 2/6/16 . . . due to . . . [a] left closed bimalleolar ankle fracture which required surgery."  R. 2.
Riley enclosed pictures of an ankle and a copy of an x-ray.  R. 4-5.  Any evidence relating to this
physical impairment is not relevant to the SSI claim, based on mental impairments, that Riley
pursued in this case at issue and the Court's analysis, as the alleged onset date is February 6, 2016,
well after administrative proceedings concluded.  See Medeiros v. Astrue, No. 11-cv-10465-DJC,
2012 WL 6771837, at *9 (D. Mass. Dec. 26, 2012) (citation omitted) (explaining that "any new
evidence introduced must relate to the time period during which benefits were denied"); see also
Beliveau ex. rel. Beliveau v. Apfel, 154 F. Supp. 2d 89, 95 (D. Mass. 2001) (quoting Tirado v.
Bowen, 842 F.2d 595, 597 (2d Cir. 1988)) (stating that the new evidence "must be 'both relevant
to the claimant's condition during the time period for which benefits were denied and probative'").

24

§ 416.920b(b).  The ALJ first "consider[s] whether there is an underlying medically determinable physical or mental impairment(s) . . . that could reasonably be expected to produce the individual's pain or other symptoms."  SSR 96–7p, 1996 WL 374186, at *1 (Jul. 2, 1996).[6]  If the ALJ finds that a medical impairment could reasonably be expected to produce the individual's symptoms, but the claimant's "statements about the intensity, persistence, or functionally limiting effects of pain or other symptoms are not substantiated by objective medical evidence," the ALJ must determine the credibility of the claimant's allegations "based on a consideration of the entire case record."  Id. at *2.  Relevant evidence can include the individual's own statements and reports provided by physicians, psychologists or other persons about the diagnosis, prognosis and effect of the symptoms on the individual.  Id. at *5.  Here, the ALJ found Riley's "medically determinable impairments could reasonably be expected to cause some of her alleged symptoms . . . [but] the claimant's statements concerning the intensity, persistence and limiting effects of her symptoms [were] not entirely credible."  R. 20.  While the ALJ found Riley credible "in many areas, including her current and past efforts to find work . . . she tended to exaggerate her symptoms and limitations."  R. 22.

"[I]ssues of credibility and the drawing of permissible inference from evidentiary facts are the prime responsibility of the Secretary."  Rodriguez v. Sec'y of Health & Human Servs., 647 F.2d 218, 222 (1st Cir. 1981) (citation omitted).  As such, "[c]onflicts in the evidence are, assuredly, for the Secretary—rather than the courts—to resolve."  Evangelista, 826 F.2d at 141 (collecting cases).  While the ALJ's "credibility determination must be supported by substantial

---

[6] Since the filing of this action, SSR 96-7p has been superseded by SSR 16-3p for SSI claims filed on or after March 16, 2016.  See Social Security Ruling 16-3p: Titles II and XVI: Evaluation of Symptoms in Disability Claims, 81 Fed. Reg. 14,166 (Mar. 16, 2016).  The Court still considers SSR 96-7p, as it was in effect when Riley filed for SSI and administrative proceedings occurred.  See Bowen v. Georgetown Univ. Hosp., 488 U.S. 204, 208-209 (1988).

evidence," <u>Teixeira v. Astrue</u>, 755 F. Supp. 2d 340, 347 (D. Mass 2010), "[t]he credibility determination by the ALJ, who observed the claimant, evaluated his demeanor, and considered how that testimony fit in with the rest of the evidence, is entitled to deference, especially when supported by specific findings." <u>Frustaglia v. Sec'y of Health & Human Servs.</u>, 829 F.2d 192, 195 (1st Cir. 1987) (citation omitted); <u>see</u> <u>Anderson v. Astrue</u>, 682 F. Supp. 2d 89, 96 (D. Mass. 2010). An ALJ "must make some specific findings as to the relevant evidence he considered in determining to disbelieve [a claimant] . . . [but] he need not march through every single step in his reasoning." <u>Anderson</u>, 682 F. Supp. 2d at 97 (citations and internal quotation marks omitted).

In explaining his credibility determination, the ALJ noted that Riley "appears to be of above average intelligence, and she readily admits that she has been job hunting since her alleged onset date." R. 22. The ALJ thus concluded Riley's "intellectual functioning appeared unimpaired," especially given doctors had assessed her intelligence in the "average to high average range." <u>Id.</u> The ALJ also considered that Riley was working with Mass Rehab to retrain for a new job and that she walked, shopped, did household chores and cared for her son. <u>Id.</u> The ALJ further took into account Riley's testimony that she took public transportation, cooked, vacuumed, did hand laundry, took out the garbage and got her son to school daily. R. 18; <u>see</u> <u>Teixeira</u>, 755 F. Supp. 2d at 347 (explaining that "evidence of daily activities can be used to support a negative credibility finding"). Moreover, the ALJ observed that Riley had shown improvement with treatment and medication within a matter of months and appeared pleasant and smiling, denying paranoid concerns, at several appointments. R. 18. The ALJ noted these findings were consistent with the reports of Dr. Gover, Dr. Vali, Dr. Shapse[7] and state-agency medical consultant Dr.

---

[7] Riley asserts that the ALJ should not have considered Dr. Shapse's evaluation that Riley was not forthcoming because his use of the RIBT was an "inappropriate and obsolete psychological technique." D. 20 at 16. This argument is unavailing. While Dr. Shapse did utilize the RIBT, it

Menken. R. 20-22; see Tetreault v. Astrue, 865 F. Supp. 2d 116, 126 (D. Mass. 2012) (stating that the ALJ is "entitled to disbelieve subjective complaints . . . in the face of contrary medical evidence"). Consequently, the ALJ found Riley had only mild to moderate mental limitations. See R. 18. The ALJ supported his credibility determination with substantial evidence. Because the ALJ considered the entire record and explained his specific findings, he did not err in concluding Riley's statements concerning the intensity, persistence and limiting effects of her symptoms were not entirely credible.

## V.    Conclusion

For the above reasons, the Court GRANTS the Commissioner's motion to affirm, D. 24, and DENIES Riley's motion to reverse, D. 20.

**So Ordered.**


/s/ Denise J. Casper
United States District Judge

---

was only one of nine psychological evaluations he used to determine Riley exhibited hypervigilant tendencies. See R. 305. Furthermore, Dr. Shapse found that Riley was "open to successful remediation via targeted psychotherapy." Id. The ALJ gave Dr. Shapse's report "some weight" and noted "[h]is observation concerning the claimant's defensive and evasive response style in testing [was] consistent with other evidence in the record." R. 21; see 20 C.F.R. § 416.920b(a); see also Seavey, 276 F.3d at 10. Moreover, substantial evidence existed regardless of Dr. Shapse's report. See Gordils v. Sec'y of Health & Human Servs., 921 F.2d 327, 328-29 (1st Cir. 1990).